The next case will begin 519-0361 W.C. Wiley-Moore Appellant v. The Workers' Compensation Commission, Gleason Asphalt Appley. Counsel, ready to proceed? Ready, your honor, for the plaintiff. Very good. Mr. Parreca, you may proceed. Thank you, your honor. Your honors, my name is Bob Parreca and I represent Wiley-Moore in this case and I'd like to find my argument or not confine it but generally that the commission's decision that the employee failed to prove that his condition of ill being in his right his neck right shoulder and right arm was causally related to the November 2013 accident was against the manifest weight of the evidence. And briefly, your honor, there was the client went to the respondent's IME, Dr. Backer, a board certified neurosurgeon that agreed that the acts he was there that his condition of ill being was related to his fall. He should remain off work. He suggested that before Dr. Pervines, Scott Pervines, another board certified neurosurgeon who was the actual treater before he did any neck surgery, he recommended that the my client go see a Dr. Thomas. He didn't recommend Dr. Thomas but see an with the neck surgery. And he did that and Dr. Thomas ruled out that the shoulder was a cause of the neck problems and put him on a five pound weight restriction. And then Dr. Pervines had recommended the surgery but then wanted another MRI that was done in June of 14 which confirmed what Dr. Pervines said was pathology that he thought was of recent nature is how he testified to that. So generally speaking, the case is usually over. You have the IME or the section 12 examiner and a treating doctor in agreement. There was a little pause for several weeks as to what was going on. And we received the records review exam of Dr. Richard Lehman. And that's I'd like to focus in on that exam because his testimony I believe is preposterous. He has no foundation basis to make give opinions to a reasonable degree of medical certainty as to whether this guy could work during these intervals with the doctors whose records he's relying on for testimony. Your honors. He didn't even see my client. He's relying on records. Dr. When we took Dr Lehman's deposition, he and every doctor related his injury to a fall in a manhole on November 20 of 13. So my question is, and I don't want to question the court, but my problem with Dr. Lehman's testimony is what is this basis to say these periods when he went to the doctors that examined him clinically said he should remain off work? How can he differ? Or what is his education or is his evidentiary foundation to make any opinions on whether the guy could work when he never even saw him? And he's relying on the records of the doctors that he reviewed that said it was he was unable to go to work. It was related to the engine. Mr Parika, can I just interject the question before we get to Dr Lehman's the efficacy of his opinions? What is your reaction to the fact that the arbitrator in the commission who adopt the arbitrator's decision in full had problems with the claimants credibility? Well, that's what we do with that. I'm glad you asked that question, Your Honor, because I addressed that in my brief. The arbitrator first was wrong that my client miss stated the date of his accident. He gave the correct date. The person that gave the incorrect date was Dr Lehman in his report. Okay, we'll accept that. We won't get hung up on that. But the commission specifically pointed out the fact that the claimant did not tell Dr Purvines about two automobile accidents which he was Well, it would be, but he did. Dr Purvines referred to that in his evidentiary deposition I took as the episode. He told him about that episode and the reason it's not, uh, that important in this case is Dr Purvines had given his opinion for surgery on July 8th of 14 before all this other stuff even occurred. But he did discuss it with Dr Purvines. And the other way to raise was he couldn't. He was having trouble talking about this neck problem he had from an injury when it came out in the testimony that he had shingles from it. That's what the problem was. So you take issue with the with the commission's finding that there were some inconsistencies and incomplete statements from the claimant about his medical history. You disagree with that fact finding? Well, I don't necessarily disagree with some of the in his dissent. He thought those inconsistencies cited by the arbitrator were were insignificant and by no means dispositive causation is the way he said it in his dissent. Uh, and I and and and actually, your honors, the reason it's not important is there's a clear even in Dr Lehman's report that's in evidence. He gave a clear path of this guy's treatment from November 20th injury all the way to the recommendation of surgery. Uh, I don't know how Dr Lehman can give his opinions on anything. I think he could look at two MRIs and say they're different or the same or and make some. But how does he testify? What is the foundational basis or the competency for him to say whether my client could work on a certain day when he didn't even seen and the records that he relied on? I know I'm being redundant, say that he remained off work from those injuries. If he's relying on the records and there's no independent, uh, you know, testimony or anything that he had, which he didn't. He simply relied on the records. What is the, you know, what is the basis of his testimony? Say no further medicals required. It's not related. Let's assume you've got some legitimate criticisms of Lehman for the moment, but I have to ask you a very mundane question. Who carries the burden? Uh, in a worker's or is it up to the petitioner to prove the case? Well, it's up to the petitioner. But as the court knows, the Supreme Court case says this is a remedial statute, and you're supposed to. There's supposed to be some deference towards the engine employee to accomplish the purposes of the act. So if the commission makes a finding that the claimant is not credible, they make a finding that the testimony of the experts are based on flawed, flawed foundation based on self reported inconsistencies and incompleteness of what do we do with that? That's fine. Do we substitute our judgment for that of the commission? I credibility and wait. I don't believe so, Your Honor. But when it went when the test when their testimonies based on such outright are their opinions based on such outrageous testimony of a doctor. And if you take out Dr Lehman's testimony totally there, there's it would be a hands down for the petitioner in this case. And even as Commissioner Terrell said in his dissent there, he thought I met my burden of proof. It might be a hands down if they believe the claimant if they found him credible and they found the medical history given to the experts to rely on was credible, but they obviously didn't. Well, Your Honor, that was not on on injury. It was on these peripheral facts that he my clients, not a rocket scientist. He probably barely got out of high school if the facts were known, and he they would bring up dates and things that he had to really sit there and think about. So I don't think it was fair for him to be labeled not credible. And I think arbitrator Terrell agreed with that. And I pointed out what the inconsistencies were in, you know, in my brief with that. I briefly laid out there was nothing uh, that was actually germane to causation in this case and the need for surgery. But I understand the court's point. Uh, go ahead. Well, Your Honor's basically, uh, I keep getting back here. Here's an arbitrary Commissioner Terrell brought this up in his dissent to the fact that he felt like the arbitrator was trying to discredit Dr Pervines, the treating doctor and even Dr Backer, the respondents on Section 12 examiner. He couldn't understand that. I can't understand it either. When you have in the record, Dr Lehman, uh, was reprimanded and signed a reprimand manned agreement from the Missouri State Board of Registration for Healing Arts for professional misconduct, where the attorney actually had his client wear a wire into the doctor's exam, which, uh, is implicit about. He believes something wasn't gonna be done proper, and the guy admits that he phoned it up an examination that he didn't even do, which comes in, which is a peripheral issue in the case. I wanted that reprimand admitted into evidence because it was a prior inconsistent statement in his deposition with me. He was trying to say it was something one of his staff members fault. She messed up following some template or something, which is not what the reprimand says that he signed its official with the Missouri board. So, uh, he has absolutely no credibility. And even your honors, without bringing any of that in, if you just look at the testimony that he made, how could he sit there based on a reasonable degree of medical certainty and say whether or not an individual could work on a day based on looking it to M. R. I. S. That were three and four years old. That's what the basis of his opinion was on the client's ability or inability to work at that time from an injury that happened in November of 13. He's looking at M. R. I. S. Data 2008, nine and 11 saying, Well, at the very worst for my client, it would be an aggravation of any condition that he had that Dr Lehman is describing. But just doctor offering that opinion goes along with the Missouri healing arts lack of professionalism. And from our perspective, he has no foundational basis to even make those opinions. He was, I stated earlier this. There's two board certified neurosurgeons pretty much in agreement. Here's an orthopedic surgeon's never ever done a neck surgery in his life, uh, questioning what they're doing. And then, as Dr. Provines put out, there was recent pathology that was not years old is the way he described what was in the M. R. I. So I don't know how the arbitrator would take you know this doctor's opinion over the section 12 examiner that the respondent hard and then the treating doctor who's got no acts in the fire. Let me ask you a point of question. I'm not saying that that's the case necessarily here at this point. But hypothetically, if you have a situation where the commission again finds the claimant to be less than credible and they find that the on a flawed presentation based on incomplete, inconsistent, self reported records by the claimant, they find there's no credibility there. What happens then? Well, if if, uh, well, I'm trying to think if everything's above board and it's just a different opinion of fact, and the commission went with that opinion, I guess the petitioner it's bad luck for me and my my client. But in this particular instance, where you have such a deviation from the standard procedure of a doctor, I mean, I just can't fathom him making giving those opinions based on looking at two M. R. I. S. That are years old and totally discounting this guy worked for 10 years and heavy construction industry, and he was working 90 days for this respondent before he got hurt. I understand your point, and I think it's a legitimate point. But I've taken layman out of the equation and the question I just gave you talking about the commission, finding essentially a lack of proof, finding the credibility of the claimant and the testimony of the doctors to not be persuasive. Yeah. Well, taking layman totally out. I don't know how how the arbitrator would have a choice unless there's some, uh, blazing wrongdoing by the two doctors suggested to you what the choice would be and what it would be based on. But I don't want to believe it. Well, I probably judge. I understand, you know, the manifest weight argument. I understand. In a certain service sense, I'm sure I would lose when there's some credible facts being weighed against me. I understand that point. But in this particular case, it's just so preposterous. What? I cross examined this guy for. I couldn't get him to admit that he brought up a football player. I go, Hey, if a football player is playing and all of a sudden he gets hit real hard and he's leg hurts real bad and he's taken out, I'm a doctor. You'd have to agree that that that hit by that linebacker had something to do with his in. Oh, I can't make that leap council. I can't make that leap, but he could make the leap about looking at an MRI that's years old and saying, Oh, well, that's this guy's falling a manhole that I'm a rabbit football fan, Mr Prickett. So I probably abuse you on that issue. But are you coming further on this? Right? I got the same observation for you that I had for the prior argument. You're supposed to cite to official reports, not the northeast. Second, the state doesn't supply us with northeastern reporters. And you've throughout your brief here, you're citing to unofficial reporters in the future. Follow the Supreme Court rule. I will definitely do that, Your Honor. And I hate to confess to you that I did not know that that was not official. I apologize to the court for that. Okay, Mr Pricky, your time is up. You will have time in reply. Thank you, Your Honor. Uh, Miss Son, is it? Yes, Your Honor. It's on. You may proceed in response. Good morning, Your Honor. May it please the court. My name is Shirley Lydia Sand, and I represent the employer Gleason Asphalt. In this case, I'm here today to ask you to uphold the decision of the Oil and Workers Compensation Commission in its entirety. Commission was correct for the following three reasons. It was correct in finding that the employee's current condition was not causally related to a work related injury. It was correct in ruling against the emission of the employee's exhibits, and it was also correct in finding TTV benefits, medical bills, prospective medical and fees and penalties not to be awarded to the employee. The commission did not air what I found that his current condition had no causal connection to a work related injury. The employee failed to meet his burden regarding causation. He had significant pre existing issues to his cervical spine, and his lack of credibility to both his treating physicians and at trial more than supports a finding of no causation. It was involved in a 2008 motor vehicle accident involving the cervical spine,  he also had two previous workers compensation claims with a different employer, including one where a tree fell on his cervical spine, and he had two prior MRIs in 2009 and 2011. It showed just osteophyte complexes and just bulges at C4 and C5 and C5 and C6. Did he relate all those facts, those those prior medical histories to his experts? Did he or did he leave some things out? These, these were not given to Dr. Purvines. These were found through our medical canvas that the respondents did. These all were given to Dr. Lehman, who was our section 12 examining examiner. So Purvines didn't know about some of these traumas or these injuries. Is that what you're saying? Purvines didn't know about any of these, your honor. Um, he suffered in November of 2013. He was five days after the work related accident. On that date, he only stated that he injured his right shoulder, right elbow and right knee. It wasn't until 10 months later, the employee amended the application to include the cervical and lumbar spine. But this was after a mention of surgery by Dr. Purvines and after he had those two additional motor vehicle accidents. Furthermore, he was not credible at trial. He had testified that he'd never take diazepam before he was prescribed it by Dr. Purvines. However, he was arrested a month before the work related accident. He pled the fifth when asked if he was arrested for methamphetamines, alpralizam and diazepam. And then when asked about his prior workers' compensation claims involving the cervical spine, he replied, I'm not sure. When he treated with Dr. Purvines, he let, he never told him about any of the treatments regarding his cervical spine. Dr. Purvines never reviewed any of the prior medical records or the prior MRIs. And he also didn't know about any of the intervening accidents that happened throughout the course of his treatment. Dr. Purvines did not have all the relevant and necessary information regarding the employer to make an accurate diagnosis and a proper assessment with regards to causal connection. Mr. Parika stated earlier that we obtained a section 12 examination with Dr. Bakker. He noted that the employee was not a good historian regarding his previous treatment with his cervical spine or his current treatment involving the work related injury. He recommended an evaluation for the right shoulder and the cervical spine to obtain a complete workup in a time that he needed to MRIs to compare it to the 2014 one. This treatment was authorized by the employer. On July 8, 2014, Dr. Purvines only reviewed the recent 2014 cervical spine MRI. He stated that the employee needed to be quote, evaluated by a shoulder expert before proceeding with or considering any surgery of the Mr. Parika stated earlier that these were not important. However, one of the motor vehicle accidents, he was put in a back and neck brace and transported via ambulance. The second motor vehicle accident in August 2014, he was sideswiped by another car and he hit a pole. It wasn't until September 11 of 2014 when Dr. Purvines recommended the C4 C5 and C5 C6 discectomy infusion. At that time, he did not know about the motor vehicle accidents that happened in both July and August. He also was involved in two other, um, incidences, one in mid 2014, where he was involved in a home invasion. At trial, he testified that he had injured his left shoulder. However, the medical records show that it was an injury to the cervical spine and his right shoulder. On December 1st, 2014, after a large storm, he went to the emergency room stating that he had injured his cervical spine and right shoulder and right arm after picking up multiple tree limbs, window screens and windows. He never reported a work related accident. If you look at the medical records on that date, he stated that his cervical spine has gotten worse after the motor vehicle accidents. By this time, Dr. Backard had retired and the employer had obtained a section 12 records review with Dr. Lehman. Dr. Lehman had all the medical records, the prior medical records regarding the motor vehicle accidents, the fall down the stairs, his treatment regarding his two previous workers compensation claims, the prior MRIs and all the current treatment that he underwent with Dr. Purvines and with the emergency rooms where he had the two motor vehicle accidents, the home invasion and his injury working at the yard. He's only doctor in line with the home invasion. Was there any allegation that he was injured during the home invasion? Yes, two men invaded his home and they got into an altercation and he was hit in the right shoulder. Your honor. Dr. Lehman testified that the employee had a long-term facet arthroscopy. He looked at the prior 2009 and 2011 and compared it with the 2014 cervical MRI and it showed no acute changes and that there weren't even any further degenerative changes. Dr. Lehman is the only doctor who had a comprehensive and complete medical history to make an informed opinion regarding causation. Now, if the employee wanted to get the best treatment and care, he would have provided Dr. Purvines with a complete and accurate history regarding his previous treatment of the cervical spine instead of tailoring and modifying what he reported to him. His poor credibility, his omissions regarding his previous treatments and his tailoring of only a work-related accident to Dr. Purvines and not about those four intervening acts was forcing Dr. Purvines to make an unreliable causation opinion and it was deliberate. The commission was correct in finding that his current condition was not related to the work-related injury. There were further issues regarding regarding medical records and Dr. Lehman's testimony as well. The commission did not abuse its discretion when the employee's medical records and other subsequent exhibits were excluded from evidence. Illinois rules of evidence apply except when they conflict the Act. Section 16 of the Act is clear. For medical records, bills, and off work slips submitted evidence, it must be subpoenaed or certified pursuant to the Act and it wasn't done here. Mr. Pariga didn't really go into too much regarding the medical records, but he argued that the medical records should be let in for a myriad of reasons. However, the stipulation that while some of the records that Dr. Lehman did review for his for his records review are the same as what it would have been for his exhibit number three, one cannot assume that they're one in the same. Further, it was also noted by Justice Hoffman that Mr. Pariga had cited two unofficial reports as well. He also cited two different cases, Fentel, Tufo, Chevrolet, and United Electric Coal, which have been overturned by national wrecking. National wrecking is clear, and this court in 2002 found that if there is a reliability exception regarding medical records, then it would render Section 16 in the Act moot. It would bypass both Section 16 and the rules of evidence, thereby eliminating foundation requirements altogether. So the Commission was proper when it found that at minimum the employee had to adhere by the minimum requirements of Section 16 to obtain medical records, medical bills, and off work slips via subpoena or certification. We also spoke about further issues regarding his exhibits with Dr. Lehman. The employees attempting to once again enter exhibits that were properly rejected and or never presented at trial. He's talking about the settlement agreements between Dr. Lehman and the state of Missouri, however that was excluded as evidence. The Commission was correct in finding that that should have been admitted at Dr. Lehman's deposition and not at trial. He also attempts to introduce unrelated depositions regarding Dr. Lehman at trial as well, however depositions for specific circumstances pursuant to Hubert versus Dell. We had to have notice of the deposition and the opportunity to cross-examine Dr. Lehman regarding the same, and the employer did not have the option to do so in this case. He also attempts to admit a new case as appendix to his brief before this court as well. It is against the Illinois Code of Civil Procedure. This is an unrelated case with involving another employee, involving another employer to attempt to have this honorable court consider that his previous inconsistent and improper evidence by once again trying to put in this decision improperly. And even if this court were to consider that case that is a part of appendix D under his brief, please note that Dr. Lehman admitted that the employee in that case accident was a factor to causing his current symptomology, and that is not the case here. Dr. Lehman's opinion regarding causation did not alter. He concluded that the employee's current condition was not causally related to the work-related injury. And as the commission probably found that there's no causation due to the employee's lack of credibility, it did not err in denying prospective medical, outstanding TTD, a credit for proper and prior benefits paid, and no fees and penalties. It must be noted that the employee did not address fees and penalties in his brief except for one sentence in the conclusion. And even if this court were to consider fees and penalties, the employee reasonably relied on Dr. Lehman's records review and opinion to justify our decision to suspend benefits, as he was the only doctor who had knowledge of all of his pre-existing injuries, all of the medical records, including the MRIs, and all of his treating records with Dr. Pervine and the medical records regarding all of his four intervening incidences. In conclusion, I'm asking this Honorable Court to affirm the decision of the Illinois Workers' Compensation Commission in its entirety. In summary, the employee was not credible to his treating doctors or at trial, and therefore this commission probably found that his current condition was not related to a work-related injury. The employee's exhibits were probably excluded pursuant to Section 16 of the Act, Illinois Rules of Procedure. The employee's CTD benefits, medical, prospective medical, and fees and benefits, sorry, fees and penalties were probably denied. Thank you so much for your time and consideration. Thank you, counsel. Mr. Perica, you may respond or reply. First, most importantly, I'd like to respond that Dr. Pervine's surgical opinion relied on an MRI of June 2nd, 2014 before any June 9th incident, and that Dr. Pervine's did discuss that with my client and referred to it as the episode, and I've cited to that page in my brief. That's just totally not true. Dr. Pervine said in his practice as a practicing neurosurgeon, he generally finds out why the client's there, what happened, and investigates himself from there, which was one of the reasons he got the June 2nd, 2014 MRI that showed the current or more recent pathology than the older ones that they brought up from 2009 and 11 that has really nothing to do with this injury, and if it did, it would be an aggravation of a pre-existing condition at its worst. On the issue of TTD, your honors, the arbitrator relied on Dr. Pervine's reasonable degree of medical certainty that my client, off work from the days before he saw him, keeping in mind Dr. Lehman looked at records a year and a half later, he looks at these two MRIs and says with specificity that, oh no, he wasn't off work due to that fall in the six-foot manhole. It was because these MRIs back in 2008 and 2009, it's just a progression, which I think is just absurd that he's got any foundation to do that. The arbitrator, relying on Dr. Lehman's testimony, I've never seen this done in a work comp case, went back and took all the TTD that was paid during the time he was off up through the hearing, just basically took it away and said that's a credit for the employer, notwithstanding that their own Section 12 IME, Dr. Bakker, had had Mr. Moore off work, the treating doctor had Mr. Moore off work. Dr. Bakker, the Section 12 examiner, said it's related back to when he fell in the manhole because that's when he had the immediate onset of pain, and I cite that all in my brief. These MRI and occur after Dr. Purvine's recommendation for surgery, July 7th, so for whatever they're worth, it has nothing to do with this particular injury. So those things, now on these medical records, Dr. Lehman's entire deposition and report was based on the medical records that he reviewed, which we covered in his deposition, which are the same records that are in evidence, your honors, Dr. Lehman's reports in evidence, and it's got a summary of all the medical that I'm talking about. And for them to object to the records that their expert is relying on, I don't understand it. If they want to, they objected to the records on hearsay grounds, and I note that during the deposition of Dr. Purvine's, as we customarily do down here as a professional, we don't try to bog down the opposing lawyer when he's doing his evidence depo with all these foundational requirements at that time because of cost. The records that Dr. Lehman used are the same records that I wanted to put in evidence, the same records that I cross-examined him on for almost an hour, and the same records that he's filed a summary with in his report. Why I didn't have a certification page on the front of those records, I don't know, but I even, I guess I didn't do it clear enough because the commission ruled against me that I stipulated to the admission of any records they wanted to use at Dr. Lehman's deposition, and I cross-examined for over an hour on those records. I apparently mistakenly believe those records would have to be in evidence for Dr. Lehman's deposition not to be hearsay because if the records are not admitted because they're hearsay, any testimony based on those records would be double hearsay and not admissible. So in that regard, I argued to the arbitrator we should strike Dr. Lehman's entire deposition if the records aren't coming in that form the basis of his whole opinion in this case. But that being said, I simply asked the court to look at the testimony of Dr. Lehman as compared to Dr. Pervines and their own Section 12 IME and find that my client's fall in the manhole on November 20, 2013 was causally related to his medical treatment and TTD that he had been receiving all the way up to the point of that hearing. Thank you, Mr. Perica. Thank you, Ms. Son.